**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **THOMAS W. KIRKENDOLL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:04-0789** |
| **v.** | ) | **JUDGE ECHOLS** |
| | ) | |
| **GLENN L. MCCULLOUGH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pending before the Court is Defendants' Motion for Summary Judgment (Docket Entry No. 39), to which the Plaintiff, Thomas W. Kirkendoll, has responded in opposition.

**I. FACTS**

Plaintiff is an African-American who has been employed at the Cumberland Fossil Plant ("Cumberland") since June 7, 1971. He filed suit against Defendants Glenn L. McCullough, Chairman of the Tennessee Valley Authority ("TVA"), and Skila Harris and Bill Baxter, members of the TVA Board of Directors, in their official capacities, seeking recovery for alleged racial discrimination and retaliation in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (2000).

Cumberland is TVA's largest, coal-fired electric generating plant with two units, each capable of producing more than 1300 megawatts of power. Cumberland is a key element in TVA's efforts to provide economical and reliable electric power to the Tennessee Valley region. Proper work performance by plant personnel is essential to maintaining Cumberland's availability to the TVA power

system. Because plant operations involve high voltages, high temperatures, high steam pressure, and rapidly rotating equipment, safety is a paramount consideration. An accident can endanger the lives and health of plant personnel and pose a risk to plant equipment and operation.

Over the thirty-four years Plaintiff has been employed at Cumberland, he has "worked his way up" through various employment positions. At the time of the events at issue in this case, he held the position of Shift Operations Supervisor on the night shift. Therefore, Plaintiff was the senior TVA manager on duty on site during his shift, and he was responsible for the safe and efficient operation of the power plant. Plaintiff directly supervised a minimum of eleven workers, including two unit operators, eight assistant unit operators, and one entry-level Shift Operations Supervisor. Additionally, during off shifts and weekends, Plaintiff supervised maintenance foremen and craftsmen. (Docket Entry No. 44-2, Position Description.) Between 2000 and April 10, 2003, Plaintiff was supervised by David L. Egner, Operations Manager.[1]

On April 10, 2003, plant management called a meeting to give Plaintiff a warning letter for unacceptable performance. (Docket Entry No. 44-3, Warning Letter.) Attending the meeting were Plaintiff, Egner, D. Lee Boggs, Lead Human Resource Consultant, and Tim Czubakowski, Assistant Plant Manager. The warning letter,

[1]Egner is now Developmental Manager assigned to the maintenance department at Cumberland.

signed by Egner, set out in detail numerous allegations made against Plaintiff concerning his "repeated failure to show good judgment, to properly prioritize work, to demonstrate positive leadership and to follow required procedures." The identified events spanned a time period from October 23, 2002, to March 3, 2003, and concerned failure to follow proper procedures, proposing use of procedures that might cause personal injury to workers and damage to plant equipment, and leaving work early.

Egner notified Plaintiff he would be immediately relieved of his regular duties and reassigned to a remedial plan of action on day shift under the supervision of Czubakowski without change in position, title, or reduction in base pay. However, Plaintiff did lose his shift differential pay. Egner further notified Plaintiff he would be prevented from supervising anyone and he would not have direct involvement with the operation of the plant. Egner also told Plaintiff he would be given an opportunity to correct his performance violations and to work on a corrective action plan, to be developed by Egner and Czubakowski, with weekly progress review. Plaintiff's annual leave account was docked for the hours he left work early.

According to Egner, upon receiving the warning letter, Plaintiff denied that he had taken any dangerous actions and claimed his actions were appropriate risks that he was willing to take. (Docket Entry No. 44-1, Egner Decl. ¶ 5.) Also according to Egner, about two to three minutes into the meeting, Plaintiff asked to leave. When asked where he intended to go, Plaintiff hesitated

a moment and then stated he had to go to the restroom. Egner stated to Plaintiff that he needed to stay until the discussion was completed. Plaintiff again mentioned leaving for the restroom and Egner replied, "Tom, please go to the restroom if you need to." After Egner said this, Plaintiff sat down and read the warning letter. After the ten-to-fifteen minute meeting concluded, Egner accompanied Plaintiff to the control room area to retrieve his belongings and they walked back to the office wing. During this period, which lasted approximately ten minutes, Plaintiff did not use or ask to use the restroom facilities. (Id. at ¶ 6.)

Plaintiff refused to sign the warning letter, and he claims all of the allegations in the letter are false. (Docket Entry No. 49-1, Kirkendoll Aff. at ¶ 7.) Plaintiff provides "annotated statements" regarding each of the incidents discussed in the warning letter, but he does not indicate when he wrote the notes or for whom. The notes appear to be his response to the points made in the warning letter. (Id., Exs. 9-12, 15-16.) Plaintiff asserts he has not posed a risk to plant equipment and operations, no one has been hurt or endangered by any of his actions, and he has not "tripped" one of the units causing loss of power generation. (Id. at ¶ 5.) He contends to the contrary that the actions of white employees, Ben Trinkle, Jimmy Patterson, and Jeff Armstrong, caused TVA millions of dollars in damages. (Id. at ¶ 5, Exs. 5, 6 & 7.) Plaintiff claims that two of the incidents involving white employees occurred during the same evaluation period as Plaintiff's; yet, the white employees received acceptable

performance evaluations and Winning Performance Awards for the 2003 fiscal year, while he did not. (Id. at ¶ 5.) Additionally, he claims certain employees were caught viewing pornographic material on TVA computers and those individuals received acceptable performance evaluations and Winning Performance Awards for the 2003 fiscal year while he did not. (Id. at ¶ 6, Ex. 8.)

Plaintiff alleges that he requested the opportunity to use the restroom more than once during the April 10, 2003 meeting because he was taking medication, but Egner told him, “No.” (Id. at ¶ 10, Ex. 19.) Plaintiff also states that Egner took disciplinary action against four other employees for leaving the site without approval. When Egner concluded the investigation, however, he discovered the behavior was accepted and widespread and he removed the letters of reprimand from all of the white employees’ files, but not from Plaintiff’s. (Id. at 7, Exs. 13, 14.)

On June 30, 2003, Egner learned that Plaintiff was proctoring an oral examination for a unit operator. Egner directed another Shift Operations Supervisor who was not on a remedial plan to relieve Plaintiff at the next break and complete the examination. (Egner Decl. at ¶ 8.) Plaintiff contends that he has proctored examinations on numerous occasions for approximately twenty-five years and he was authorized by the Training Manger to administer the examination on June 30, 2005, if two other individuals were unavailable to administer the examination. (Kirkendoll Decl. at ¶ 9, Ex. 18.)

All Shift Operations Supervisors, together with virtually all other managers at Cumberland, received identical ratings on seventy percent (70%) of their Performance Review and Development Plans (PR&Ds) for fiscal year 2003, which included two "unacceptable" ratings. (Docket Entry No. 43-1, Boggs Decl. at ¶ 4.) The PR&D is comprised of several sections, including one describing the employee's objectives with summaries and ratings of the employee's performance on those objectives; a section called, "Winning Behaviors," which consists of twenty items from which the employee is to select no fewer than eight items for rating; and an overall summary of performance. (Id. at ¶ 3, Ex. 1.) Both of the "unacceptable" ratings were universally applied because Cumberland had experienced an excessive number of unscheduled outages.

Plaintiff received one additional unacceptable rating on the PR&D. (Id.) The remaining thirty percent (30%) of the overall performance rating on Plaintiff's PR&D was based on the ten "Winning Behaviors" on which he chose to be rated. Of the ten items selected for rating by Plaintiff, he was rated "unacceptable" on one area, "Casts a positive shadow of influence. Sets a positive example for others at work." (Id. at ¶ 5.) According to Boggs, Plaintiff deserved this low rating because he repeatedly put himself and his co-workers at risk of injury or death and the plant at risk of damage or failure as cited in the April 10, 2003 warning letter. (Id.) The unacceptable rating on this portion of the PR&D amounted to three percent (3%) of Plaintiff's total service review.

As a result of three unacceptable ratings, on November 7,

2003, Plaintiff received an overall, unacceptable score of 1.96 on his PR&D for fiscal year 2003. Because his overall service review rating was below 2.0, he was not entitled to, and did not receive, a Winning Performance Award bonus or a raise in pay in the fall of 2003. No Cumberland managers with a rating below 2.0 received a bonus or a pay raise that year. (Id. at ¶ 6-7.)

Plaintiff claims that, during fiscal year 2003, he was under the supervision of Egner for the first six months and under the supervision of Czubakowski for the last six months. Plaintiff claims he did not receive the Corrective Action Plan Egner promised during the April 10, 2003 meeting, and Czubakowski showed Plaintiff only a draft Corrective Action Plan that was not signed by Egner or Czubakowski. When Plaintiff received his 2003 evaluation, Plant Manager Leonard W. Hancock reviewed the PR&D with Plaintiff. Even though Czubakowski reported that Plaintiff did well in the tasks Czubakowski assigned him, Plaintiff claims Hancock refused to rate him for anything that occurred after Plaintiff received the warning letter on April 10, 2003. (Kirkendoll Decl. at ¶ 2, Exs. 1, 3.) Plaintiff alleges that TVA policy requires a supervisor to conduct an evaluation on a quarterly and an annual basis, but that policy was not followed for him. Plaintiff asserts a white male, Jimmy Patterson, also had two different supervisors in one year. Each supervisor conducted an evaluation for his respective time frame of Patterson's supervision. (Id. at ¶ 3, Ex. 2.) Thus, Plaintiff contends the utilization of Egner's review for the first six months



Case 3:04-cv-00789 Document 53 Filed 01/03/06 Page 7 of 23 PageID #: 207

of fiscal 2003 unfairly depressed Plaintiff's PR&D for the year and served as a pretext for racial discrimination.[2] (Id.)

Boggs filed a second Declaration, in which he stated that Plaintiff's fiscal year 2003 PR&D rated his performance as a supervisor during the first six and one-half months more heavily than his performance thereafter on the nonsupervisory remedial plan. The rating on the factor, "Casts a positive shadow of influence. Sets a positive example for others at work[,]" was based on Plaintiff's supervisory failures through April 10, 2003, "which were too serious to be offset by his nonsupervisory conduct over the following five and one-half months." (Docket Entry No. 52-1, Boggs Second Decl. at ¶ 2.)

Boggs also explains that Patterson received two evaluations because he was promoted from a Unit Operator position in the bargaining unit represented by the International Brotherhood of Electrical Workers to a management schedule, Shift Operations Supervisor position on March 25, 2003. Upon his promotion, Patterson received a partial year, "Trades and Labor Employee Service Review" and at the end of the year he received a Shift Operations Supervisor review. Plaintiff, as a management employee for the entire year, was not eligible to receive a "Trades and Labor Employee Service Review" at all, let alone a partial year review like Patterson received. (Id. at ¶ 3.)

---

[2]Plaintiff claims Hancock told Boggs that he was going to give Plaintiff an "unacceptable" rating on his annual evaluation no matter what Plaintiff did after April 10, 2003. (Kirkendoll Decl. at ¶ 4, citing Ex. 3, Boggs' Depo.) This is inadmissible hearsay.

Boggs further explains that Michael S. Howard, who sent an e-mail scheduling Plaintiff to proctor the June 30, 2003 examination if two others were unavailable to do so was not a TVA manager and he was not in Plaintiff's chain of command. Howard did not have authority to determine whether Plaintiff was eligible to proctor tests. (Id. at ¶ 4.) According to Boggs, Plaintiff was not allowed to proctor tests involving safety procedures because he had been removed from his supervisory duties due to violations of safety procedures which jeopardized the safety of employees, damaged the plant, and resulted in him being placed on a disciplinary remedial plan.

With regard to Winning Performance Award bonuses, Boggs attests that the payout for all employees is reduced for each plant outage, plant delay, plant inefficiency or injury to personnel. However, employees and supervisors generally are not individually disciplined just because a bad result occurred "on their watch." (Id. at ¶ 5.) However, disciplinary action may be taken against an employee or supervisor who demonstrates a continuing lack of respect for plant policies and safety procedures. Therefore, when "isolated events" caused plant outages under white Shift Operations Supervisors Patterson and Armstrong, neither of them were subject to disciplinary action. Similarly, in 1982, Plaintiff did not receive a disciplinary action when Cumberland "tripped" twice on his watch, even though it was noted that "'Mr. Kirkendoll has had two unit trips on startup that in all probability could have been avoided.'" (Id. & Ex. 1.) Boggs attests: "On the other hand, even

when no injury to life or property occurs, a supervisor, such as Mr. Kirkendoll, is properly disciplined when he or she demonstrates a cavalier attitude towards plant policies and safety policies." (Id.)

Boggs notes Egner promoted two African Americans, Daniels and Rogers, to the position of Shift Operations Supervisor on October 23, 2000. During fiscal year 2003, three of Egner's sixteen Shift Operations Supervisors were African American. (Id. at ¶ 6.) Plaintiff asserts, however, that Egner acknowledged during his deposition he was likely present when racial jokes were told while he was an assistant unit operator or unit operator at TVA. (Kirkendoll Decl. at ¶ 11, Ex. 20, Egner Depo. at 132-133.)

Finally, Boggs attests that, while the warning letters for leaving the site without authorization were removed from the files of four union-represented trades and labor employees, similar warning letters remained in the files of Plaintiff and Booth, a white male Shift Operations Supervisor. Boggs states that Plaintiff and Booth, as managers with more responsibility, were disciplined because the other employees claimed to have been following the example of managers like Plaintiff and Booth.

Plaintiff exhausted his administrative remedies except for the matter of compensatory damages, as explained in the Court's previous Memorandum and Order entered June 24, 2005. Defendants now move for summary judgment on all pending claims of racial discrimination and retaliation.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there is not a genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party,

drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A. Racial discrimination

Plaintiff can establish a Title VII claim of racial discrimination either by introducing direct evidence of discrimination or by proving circumstantial evidence which would support an inference of discrimination. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995). Plaintiff has not identified any direct evidence of TVA's racial discrimination against him. Consequently, this case will follow the familiar burden-shifting formula. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-143 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973).

To establish a *prima facie* case of racial discrimination, Plaintiff must show (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for his position; and (4) he was replaced by, or treated differently than, a similarly situated employee who is not a member of the protected class. See Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 828 (6th Cir. 2000). Once Plaintiff establishes a *prima facie* case, an inference of discrimination arises. See id. The burden of proof then shifts to the TVA to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. Once that reason is identified, the burden shifts back to the Plaintiff

to prove that the TVA's articulated non-discriminatory reason for its action was merely a pretext for unlawful racial discrimination. Id. To show pretext, Plaintiff must prove the TVA's asserted reason had no basis in fact, the reason did not in fact motivate the adverse employment action, or the reason was insufficient to motivate the adverse employment action. Id. Plaintiff carries the ultimate burden to prove racial discrimination by a preponderance of the evidence. Talley, 61 F.3d at 1246.

Plaintiff seeks relief under Title VII for: his loss of shift differential pay and supervisory responsibilities when he received the April 10, 2003 warning letter; management's refusal to grant him a restroom break during the April 10 meeting; his removal as a proctor from a unit operator examination in June 2003; and his loss of a pay increase and a Winning Performance Award bonus because of his fiscal year 2003 performance evaluation. The Court will consider each of these claims in turn. Plaintiff satisfies the first element with regard to each claim, and therefore, the Court will focus on the second, third and fourth elements of the *prima facie* case.

*1. The April 10, 2003 warning letter*

Plaintiff suffered an adverse employment action on April 10, 2003, when TVA management removed his supervisory responsibilities and assigned him to day shift, resulting in a loss of shift differential pay. See Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004); Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, 885-886 (6th Cir. 1996). At issue are the third and fourth



Case 3:04-cv-00789 Document 53 Filed 01/03/06 Page 13 of 23 PageID #: 213

elements: whether Plaintiff was qualified for his position and whether Plaintiff was treated differently than other similarly-situated white Shift Operations Supervisors.

As to the third element, the TVA emphasizes it issued the warning letter in good faith because Plaintiff repeatedly took actions that could have jeopardized the safety of employees and damaged the plant. The warning letter stated:

> The reason for this warning is your repeated failure to show good judgment, to properly prioritize work, to demonstrate positive leadership and to follow required procedures. These incidents have been discussed with you and you were told of my expectations; however, your performance has not improved. Your poor performance has placed the plant in unsafe conditions which could have led to personal or coworker injury, equipment failures/damage and or put the unit in jeopardy.

(Egner Decl., Ex. 2 at 1.) Plaintiff declares that the content of the TVA's warning letter is false. Thus, there does exist a genuine material dispute of fact about Plaintiff's qualifications for the position.

As to the fourth element, however, Plaintiff has not shown that *any* person outside the protected class, similarly situated to him in all relevant respects, was treated differently than he was. Seay v. TVA, 339 F.3d 454, 479-480 (6th Cir. 2003). Plaintiff attests in his Declaration at ¶ 5:

> Many white males have caused TVA millions of dollars in damage to the plant. Exhibits 5, 6 and 7 are supporting documentations (sic) of damage caused to TVA by white employees. Two of the aforementioned incidents occurred during the same evaluation period as mine. Both of these individuals received their winning performance award.

Exhibit 5 is an “Equipment Outage Report.” The name “Ben Trinkle” is written on the report in handwriting, but there is no space for a name on the form and no indication who wrote the name on the report or when it was written. The document indicates that an immediate unplanned outage occurred on February 18, 2002, because the “unit tripped on low waterwall pressure.” The unit was unavailable from February 18 at 18:49 until February 19 at 03:13. The outage cost TVA $102,231 for power replacement. There is no indication that plant facilities were physically damaged or that employees were placed in any danger. No other information about Trinkle, including his job title, his job responsibilities, or his supervisors, is produced. No information about what causes a low waterwall pressure, or whether the event was actually caused by Trinkle’s personal conduct, is provided.

Exhibit 6 is an “Equipment Outage Report.” This report concerns a power outage caused by a “boiler tube leak” between June 12, 2003 and June 15, 2003. The name “Patterson” is handwritten on the page, but there is no space for a name on the form and no indication who wrote the name on the report. Jimmy Patterson was promoted to Shift Operations Supervisor on March 25, 2003, just before Plaintiff received his written warning on April 10, 2003. The unit was unavailable from June 12 at 12:11 until June 15 at 18:02. The outage cost TVA over $2 million for replacement electric. Again, there is no indication that physical plant facilities were jeopardized or that employees potentially could have been harmed. Plaintiff provides no information to explain

whether Patterson's responsibilities mirrored Plaintiff's, whether they reported to the same supervisors, or whether Patterson's personal conduct as Shift Operations Supervisor caused this "boiler tube leak" resulting in loss of the unit's power production.

Exhibit 7 is an e-mail Plaintiff apparently received from a TVA co-worker. The name "Jeff Armstrong" appears on the document in handwriting, but again, there is no space for a name on the form and no indication who wrote the name on the form or when it was written. The record does not confirm that Armstrong is a Shift Operations Supervisor. The e-mail message includes information that TVA experienced "tripped transferring station service" on September 16, 2003 at 18:55, which cost TVA $208,458 in power replacement. The message also shows that TVA experienced "operator error" on May 13, 2004 at 23:17, which cost TVA almost $2.5 million in power replacement. The May 2004 date is after Plaintiff's November 2003 performance evaluation and thus, that event is not relevant to this case. As to the September 2003 outage, Plaintiff does not provide any information about Armstrong's job title, job responsibilities, supervisors or any other pertinent information that would allow the Court to compare that event to events involving Plaintiff. There is no evidence that the incident placed workers in danger or that plant facilities were damaged.

The TVA does not disagree that TVA suffered some damage "during the watch" of Patterson or Armstrong, but TVA responds that "employees or supervisors are generally not personally disciplined just because a bad result occurred on their watch. . . .

Disciplinary actions may, however, be taken against an employee or supervisor when they demonstrate a continuing lack of respect for plant policies or safety procedures." (Docket Entry No. 51, Reply Br. at 3-4.)

The April 10, 2003 warning letter TVA issued to Plaintiff alleged a number of incidences where Plaintiff failed "to show good judgment, to properly prioritize work, to demonstrate positive leadership, and to follow required procedures," specifically: (1) on October 23, 2002, Plaintiff did not follow proper procedure for purging a generator of carbon dioxide and hydrogen gas, a clear violation of procedure; (2) on January 30, 2003, Plaintiff redirected unit operators assigned to the startup of unit 1 to place a 500kV transmission line in service even though the unit 1 startup activities had business priority; (3) on February 3, 2003, Plaintiff again showed poor prioritization of work by directing resources to repair a main condenser tube leak rather than a higher priority repair needed on an air preheater wash water isolation valve; (4) on February 4, 2003, Plaintiff failed to have protective tagging in place to allow hydrostatic testing and air testing of circuits in the unit 1 boiler; (5) on February 10, 11, and 12, 2003, Plaintiff left work before his shift ended without authorization; (6) on March 3, 2003, Plaintiff recommended that employees attempt removal of a failed 480 volt pulverizer breaker by pulling the breaker from an energized electrical board by tying a rope to the breaker and pulling the breaker off of the energized electrical bus work; and (7) on March 3, 2003, Plaintiff intended

to circumvent equipment engineering standards of Cumberland Operating Procedures to expedite rapid repair of an oil leak without due regard to the potential for collateral damage.

Even taking as true Plaintiff's position that these allegations are false, Plaintiff has not identified any white Shift Operations Supervisor who was similarly situated to him in all relevant respects such that the Court can compare TVA's treatment of Plaintiff to TVA's treatment of the white comparator. For this reason, Plaintiff fails to meet the fourth element of his *prima facie* case. The TVA is entitled to summary judgment on this claim.

*2. The restroom break*

The Court agrees with the TVA that Egner's denial of Plaintiff's request to take a restroom break during the disciplinary meeting was not a materially adverse change in the terms or conditions of his employment to constitute an actionable adverse employment action under Title VII. See Jackson v. City of Columbus, 194 F.3d 737, 752 (6th Cir. 1999); Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 410 (6th Cir. 1999). Accordingly, Plaintiff cannot prove the second element of his *prima facie* case and the TVA is entitled to summary judgment on this claim.

*3. Proctoring the examination*

The Court must take as true Plaintiff's testimony that he proctored examinations at Cumberland for approximately twenty-five years. The TVA has not produced any contradictory evidence. Egner significantly diminished Plaintiff's job responsibilities in April 2003 when he removed all supervisory duties from Plaintiff. By

directing a Shift Operations Supervisor to assume Plaintiff's examination proctoring duties on June 30, 2003, Egner further diminished Plaintiff's job responsibilities. Because the TVA relies on the April 10, 2003 discipline to contend that Plaintiff was not qualified to serve as an examination proctor, the Court concludes Plaintiff has shown a sufficiently significant diminishment of his material employment responsibilities to generate a material issue of fact for trial on the second element of his *prima facie* case. See Jackson, 194 F.3d at 752.

The TVA contends that Plaintiff still cannot satisfy the third and fourth elements of his claim. The TVA posits that Plaintiff cannot show a manager who is on a remedial plan for failure to recognize the importance of plant safety features has a right to proctor tests involving those safety procedures. As the Court noted previously, Plaintiff contends he did not ever place employees or the plant in danger and the basis of the disciplinary action against him is false. Taking Plaintiff's account as true for purposes of the summary judgment motion, Plaintiff has shown a genuine dispute of fact concerning his qualifications to serve as examination proctor.

Plaintiff has not come forward with any evidence, however, to show that a white Shift Operations Supervisor, similarly situated to Plaintiff in all relevant respects, was allowed to proctor a unit operator's examination while removed from supervisory duties and working on a remedial plan. Therefore, Plaintiff cannot



Case 3:04-cv-00789 Document 53 Filed 01/03/06 Page 19 of 23 PageID #: 219

satisfy the fourth element of his *prima facie* case, and the TVA is entitled to summary judgment on this claim.

*4. The fiscal 2003 performance evaluation*

The TVA claims Plaintiff cannot meet the third and fourth elements of his *prima facie* case with regard to his November 2003 performance evaluation. The TVA observes that Plaintiff was not qualified to receive a performance bonus and raise and he cannot show that he was similarly situated to white Shift Operations Supervisors who were treated differently than he was.

Again, the Court concludes that Plaintiff has generated a genuine issue of material fact for trial on his qualifications, the second element of the claim. Whether Plaintiff's 2003 evaluation was unfairly weighted in favor of Egner's dim view of Plaintiff's performance over the first six and one-half months of the year, even though Czubakowski reported to Hancock that Plaintiff did well the last half of the year, is a question of fact.

As suggested above, however, Plaintiff has not carried his burden on the fourth element. Plaintiff has not shown that *any* white Shift Operations Supervisor was similarly situated to him in all relevant respects for purposes of comparison in performance evaluation. Patterson and Plaintiff were not similarly situated because of the manner in which Patterson was evaluated as a trades and labor employee in mid-year and then promoted from unit operator to Shift Operations Supervisor. There is no evidence TVA management disciplined Patterson in the latter half of 2003 for supervisory shortcomings similar to those TVA management asserted

against Plaintiff in his 2003 warning letter and poor evaluation. The record reveals very little about Armstrong, and Plaintiff does not explain how he and Armstrong were similarly situated in all relevant respects for purposes of comparison on their performance evaluations. Accordingly, the Court concludes that Plaintiff cannot meet the fourth element of this discrimination claim, and the TVA is entitled to summary judgment.

**B. Retaliation**

To prove his claims of retaliation, Plaintiff must show the following elements: (1) he engaged in activity protected by Title VII; (2) Plaintiff's civil rights activity was known by the TVA; (3) thereafter, the TVA took adverse employment action against Plaintiff; and (4) there is a causal connection between Plaintiff's protected conduct and the adverse employment action. See Mulhall v. Ashcroft, 287 F.3d 543, 551 (6th Cir. 2002); EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir. 1997). As to each of the four incidents discussed above, the TVA contends Plaintiff cannot show adverse employment action was taken against him or that a causal connection existed between his protected Title VII activity and the events at issue to demonstrate unlawful retaliation. Furthermore, Plaintiff cannot show the TVA's proffered reasons for its actions were a pretext for retaliation.

Plaintiff states in his Verified Complaint that, during his thirty-four year history with the TVA, he filed administrative charges of discrimination and retaliation, and he prevailed on at least two charges before the agency. (Docket Entry No. 1, Verified

Complaint at ¶ 9.) He contends the TVA thus knew of his prior Title VII protected activity and continued to retaliate.

This alone does not meet the second element of the retaliation claim. Plaintiff must present sufficient evidence from which a reasonable factfinder could infer that Egner and Hancock knew that Plaintiff previously had filed EEOC complaints against the TVA concerning racial discrimination and retaliation. See Mulhall, 287 F.3d at 551. Plaintiff has not produced any such evidence. The Court cannot discern from this record whether Egner and Hancock were even employed as managers at Cumberland or held management positions in the TVA such that they would have known about Plaintiff's prior charges at the time he filed them.

Moreover, Plaintiff fails to carry his burden on the fourth element to show a causal connection between the filing of his prior discrimination charges and conduct he claims is retaliatory: the plant manager refuses to speak to him so other employees do not speak to him; Hancock told Boggs that Plaintiff would receive an unacceptable performance rating even though Plaintiff did well after the April 10, 2003 meeting; and no final Corrective Action Plan was ever signed and utilized.

To withstand the motion for summary judgment, however, Plaintiff must produce sufficient evidence from which an inference can be drawn that the TVA would not have taken the adverse action had Plaintiff not previously filed administrative charges. See Allen, 165 F.3d at 413. Plaintiff has not produced any such evidence tying his April 2003 disciplinary meeting, his June

removal from the exam, or his November 2003 performance evaluation to his prior pursuit of administrative charges. See id. Plaintiff has not produced any evidence of when those prior charges were filed, let alone evidence of a close temporal proximity from which the Court can infer that the adverse employment actions Plaintiff experienced were directly related to his prior discrimination charges. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001); Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000). Therefore, the Court concludes that the TVA is entitled to summary judgment on each of the retaliation claims.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Docket Entry No. 39), will be GRANTED. All of Plaintiff's claims will be DISMISSED WITH PREJUDICE.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE



Case 3:04-cv-00789 Document 53 Filed 01/03/06 Page 23 of 23 PageID #: 223